UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STANLEY J. CILETTI,<br><br>Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL,<br><br>Defendant. | Case No. 17-cv-05646-EMC<br><br>**ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT**<br><br>Docket Nos. 17, 23 |

Plaintiff Dr. Stanley Joseph Ciletti claims he is disabled by chronic headaches, migraines triggered by photosensitivity, and a knee injury limiting his ability to stand or walk long distances. He sought judicial review after the Social Security Agency denied his application for benefits. For the reasons below, Plaintiff's motion for summary judgment is **GRANTED** and Defendant's cross-motion is **DENIED**. The Court will **REMAND** for an award of benefits.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Dr. Ciletti applied for social security disability insurance benefits on February 27, 2013, alleging disability beginning on September 1, 2012. AR 29. The claim was denied on July 12, 2013 and again upon reconsideration on March 27, 2014. *Id.* Plaintiff requested a hearing, which was convened on March 9, 2016 before an Administrative Law Judge ("ALJ"). Plaintiff was represented by a non-attorney representative. An impartial vocational expert ("VE"), Jeff Beeman, also appeared at the hearing. *Id.* The ALJ denied Dr. Ciletti's claim on April 8, 2016. AR 26. Dr. Ciletti requested review of the ALJ's decision by the Social Security Appeal Council, but it denied his request on July 31, 2017. AR 1. The ALJ's decision became the Commissioner's final decision subject to review in this case.

A.      <u>Dr. Ciletti's Background</u>

Dr. Ciletti is a plastic and reconstructive surgeon who worked for Kaiser Permanente for 11 years. AR 75. In 2009, he experienced an onset of headaches, but continued to practice medicine for several years. AR 1580. At some point, Dr. Ciletti observed that his migraines were triggered by electronic computer screens. AR 1580-1581. He stopped working in October 2012 because of the severe pain caused by his headaches and his inability to interact with electronic and computer devices triggering the migraines. AR 74-75. Since shortly after the onset of his headaches, Dr. Ciletti has continuously sought medical treatment and examination. He has been medically diagnosed with migraines, AR 325, but none of the various treatment regimens he has attempted at the suggestion of various treating physicians have succeeded in preventing them. *See* AR 321, 452, 540, 625-626, 728, 1397, 1415, 1557, 1597. Doctors have prescribed him various medications that mitigate but do not eliminate the headaches; Dr. Ciletti still reports being in constant pain (always a 4 to 6 out of 10 on the pain scale if he is taking 6 Norco per day, and a 9 without Norco). AR 728. In January 2015, Dr. Ciletti experienced a flare-up in headaches, prompting a transition from Norco to long-lasting hydrocodone. AR 1317. In June 2016, he attempted yet another experimental treatment (an IV ketamine infusion over a multi-day hospital admission) because he was reporting headaches between 6 to 8 on the pain scale with spikes up to 10, AR 49, but the infusion was aborted for exacerbating his pain, AR 49, 67.

In March 2014, Dr. Ciletti injured his left knee, with an MRI confirming an acute anterior cruciate ligament (ACL) tear. AR 769, 796-798. Surgery was performed in May 2014. AR 828-914. By August 2014, Dr. Ciletti was still reporting soreness and difficulty walking. AR 1250. He received injections to mitigate the pain; it was unsuccessful. AR 1251, 1261, 1268, 1270-71. Dr. Ciletti was still experiencing knee pain with most weight bearing activities in May 2015, including walking for more than 2 or 3 blocks or standing for long periods of time. AR 1383, 1525. In January 2016, he was still reporting knee pain and an MRI showed edema in the bone. AR 1419-20, 1422-23.

B.      <u>Medical Evidence</u>

The record also includes opinions and treatment notes from two treating physicians with

respect to Dr. Ciletti's migraines (Dr. Georgi Mikeladze and Dr. Young Me Choi) and several physicians with respect to Dr. Ciletti's knee injury (primarily Dr. Christopher Lehmann). In addition, Dr. Satesh Sharma examined Dr. Ciletti a single time on June 22, 2013 (before Plaintiff's 2014 knee injury) and submitted an assessment that Dr. Ciletti could perform "medium work" to the California Department of Social Services Disability Evaluation Division. AR 548-556. The state agency consultants also assessed Dr. Ciletti for "medium work" before his knee injury. AR 38. Each physician's opinions is discussed in more detail where relevant below.

C.    ALJ's Application of 5-Step Process

The Social Security Administration (SSA) uses a five-step sequential process to determine whether a claimant qualifies for disability benefits. *See* 20 C.F.R. § 404.1520. In steps one through four, the claimant bears the burden of proving his or her disability. At step five, the burden shifts to the Commissioner to show that there are a "significant number of jobs in the national economy that claimant can do." *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Here, the ALJ determined that Dr. Ciletti had not engaged in "substantial gainful activity" since the alleged onset date (Step 1), AR 31; that Dr. Ciletti suffered from the severe impairments of chronic headaches, status post left ACL reconstruction, and degenerative disc disease of the cervical spine (Step 2),[1] AR 31; and that Dr. Ciletti's impairments did not meet or equal any of the listed impairments (Step 3), AR 32.

At Step 4, the ALJ determined that Dr. Ciletti had the residual functional capacity (RFC) "to perform medium work as defined in 20 CFR 404.1567(c)[2] who can sit, stand, and walk for six hours each in an eight hour day; and who is unable to work with video screens." AR 32. As explained above, in reaching this conclusion, the ALJ gave most weight to examining physician Dr. Sharma's assessment (though faulting her for failing to take into consideration Dr. Ciletti's

---

[1] The ALJ declined to find that several other reported symptoms rose to the level of a severe medical impairment, but Plaintiff does not challenge those findings so they are not recounted here. AR 31-32.

[2] The regulation provides that "[m]edium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c).

photosensitivity); gave "limited" weight to treating physician Dr. Mikeladze's opinion because it was "vague and did not set forth the claimant's functional abilities with sufficient specificity," AR 38; gave no weight to treating physician Dr. Choi's examination notes because they were "vague" with respect to functional limitations, AR 38; and did not explicitly state what weight, if any, was assigned to Dr. Lehmann's assessments regarding the March 2014 knee injury.  The ALJ stated that his assessment was "supported by the substantial weight of the objective medical evidence that demonstrates degenerative disc disease of the cervical spine, but rare complaints of neck pain and full range of motion, chronic headaches that are only manageable with Norco, photosensitivity to video screens, unremarkable brain MRIs, the extent of the claimant's daily living that included regular exercise and playing basketball despite his headaches, the need for ACL surgery on the left knee, the full left knee range of motion, some ongoing complaints of pain that are reduced with patellar taping and the relatively normal left MRI findings status post-surgery."  AR 38-39.  The ALJ also concluded that, in light of the RFC, Dr. Ciletti was no longer able to perform any past relevant work as a plastic surgeon.  AR 39.

At Step 5, the ALJ determined that "[i]f the claimant had the residual functional capacity to perform the full range of medium work, a finding of 'not disabled' would be directed by Medical-Vocational Rule 203.22."  AR 39.  However, the ALJ observed that "[Dr. Ciletti's] ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations."  AR 39-40.  Accordingly, the ALJ asked a vocational expert ("VE") to identify jobs that could be performed by a hypothetical "individual who can lift 50 pounds; sit, stand, and walk for six hours each in an eight hour day; and who is unable to work with video screens."  AR 40.  The VE identified the following medium unskilled occupations:  assembler (DOT 732.684-018), machine tender (DOT 706.685-010), and stocker (DOT 922.687-058).  *Id.* The VE was unable to identify any qualifying work classified as "light."  AR 110.  The ALJ, crediting the VE's testimony regarding these "medium" work positions, found that Dr. Ciletti was not disabled.  Dr. Ciletti's attorney also asked the VE to consider whether, in addition to the ALJ's hypothetical, the claimant "would be limited due to the side effects of pain and narcotic medication to the point that he would be missing three or more hours a day at work."  AR 110.

The VE confirmed that missing that amount of time would not be acceptable in the work world, so the claimant would be "less than full-time, clearly not employable." *Id.* Nevertheless, the ALJ concluded that "the extent of the claimant's activities of daily living do not support the fact that he would miss work three to four hours a day." AR 40.

## II.     LEGAL STANDARD

District courts "have the power to enter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the case for a rehearing." 42 U.S.C. § 405(g). The Commissioner's decision to deny benefits may be disturbed "only if it is not supported by substantial evidence or is based on legal error." *Robbins v. Social Sec. Admin,* 466 F.3d 880, 882 (9th Cir. 2006). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance, i.e., such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* However, "a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *Id.* (citation omitted). If the evidence can support either affirming or overturning the ALJ's decision, the Court must defer to the ALJ. *Id.* The ALJ's decision may be reversed for non-harmless error. *See Stout v. Comm'r, Soc. Sec. Admin.,* 454 F.3d 1050, 1055 (9th Cir. 2006). An ALJ's error is harmless if it is inconsequential to the ultimate non-disability finding. *Id.*

## III.     DISCUSSION

Plaintiff challenges the ALJ's failure to consider whether the migraines were "equivalent" to the medical listing for epilepsy (Step 3); whether the record contains substantial evidence to discredit Plaintiff's treating physicians' opinions, Plaintiff's own testimony, and to support the ALJ's residual functional capacity determination that Plaintiff could perform "medium" work (Step 4); and whether substantial evidence supports the ALJ's conclusion that jobs exist in the national economy within Plaintiff's abilities (Step 5). Each argument is analyzed below.

A.     Failure to Consider Headaches Under Epilepsy Listing (Step 3)

A petitioner who has an impairment that "meets or equals" a listed impairment is presumed disabled. *See Kennedy v. Colvin*, 738 F.3d 1172, 1176 (9th Cir. 2013); 20 C.F.R. § 404.1520(a)(4)(iii). To "equal" a listed impairment, the medical findings for the claimant must be

"at least equal in severity and duration to the listed findings." 20 C.F.R. § 404.1526(a). Here, the ALJ concluded that "claimant's impairments, individually or in combination, [do not] meet or equal in severity any listed impairment(s)." AR 32. He did not provide any further analysis or discussion but merely cross-referenced his "more detailed discussion of the evidence . . . embodied in the residual functional capacity analysis in Finding 5," AR 32, which does not specifically discuss any of the listed impairments either.

Plaintiff contends the ALJ erred by failing specifically to consider whether Dr. Ciletti's migraine headaches equal "epilepsy" pursuant to the SSA's Listing of Impairments. However, there is no indication that Dr. Ciletti claimed his migraine headaches were equivalent to epilepsy or attempted to introduce evidence of such equivalency. The ALJ thus did not err in failing to *sua sponte* refute such a claim. *See Kennedy,* 738 F.3d at 1178 (explaining that "[a]n ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence," and holding that ALJ did not err where claimant "never presented evidence or advanced an argument for equivalency"). The two cases cited by Plaintiff do not require such a *sua sponte* analysis, nor do they hold that severe migraine headaches are *per se* equivalent to epilepsy. *See Cattano v. Berryhill*, 686 Fed.Appx. 408, 410 (9th Cir. 2017) (holding that claimant alleging severe migraines "did not meet all the requirements for Listing 11.03, for nonconvulsive epilepsy, because there is no indication that the headaches he suffered during the insured period were severe enough to render [him] *per se* disabled");[3] *Papenburg v. Commissioner of Social Sec.*, 68 Fed.Appx. 16 (9th Cir. 2003) (holding that ALJ should have "consider[ed] [petitioner's] headaches" at step three, but making no reference to epilepsy or any particular listed impairment).

---

[3]  *Cattano* refers to Listing 11.03 for "nonconvulsive epilepsy." *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1 (May 24, 2016) (defining "nonconvulsive epilepsy" as "[i]n a child with an established seizure disorder, the occurrence of more than one minor motor seizure per week, with alteration of awareness or loss of consciousness, despite at least three months of prescribed treatment"). However, Listing 11.03 was eliminated on January 17, 2017, after Dr. Ciletti applied for benefits in February 2013 but before the Commissioner made a final decision denying his appeal in July 2017. *See* 20 C.F.R. § Pt. 404, Subpt. P., App. 1 (Jan. 17, 2017); *see* Revised Medical Criteria for Evaluating Neurological Disorders, 81 F.R. 43048-01, 2016 WL 3551949 (Jul. 1, 2016). The only listing for epilepsy as of January 2017 is 11.02, which refers to convulsive epilepsy. Neither party noted this change.

Plaintiff also relies on an example in the SSA's Program and Operations Manual No. DI 24505.015, which used to provide:

> A claimant has chronic migraine headaches for which she sees her treating doctor on a regular basis. Her symptoms include aura, alteration of awareness, and intense headache with throbbing and severe pain. She has nausea and photophobia and must lie down in a dark and quiet room for relief. Her headaches last anywhere from 4 to 72 hours and occur at least 2 times or more weekly. Due to all of her symptoms, she has difficulty performing her ADLs [Activities of Daily Living]. The claimant takes medication as her doctor prescribes. The findings of the claimant's impairment are very similar to those of 11.03, Epilepsy, non-convulsive. Therefore, 11.03 is the most closely analogous listed impairment. Her findings are at least of equal medical significance as those of the most closely analogous listed impairment. Therefore, the claimant's impairment medically equals listing 11.03.

*Id.* ¶ B.7.b. This provision of the POM is no longer operative, however. *See* DI 24505.000 Impairment Severity, Subchapter Table of Contents, available at http://policy.ssa.gov/poms.nsf/lnx/0424505000 (accessed Apr. 30, 2018). Assuming without deciding that the prior version of the POM applies in this case because it was in effect when Plaintiff filed his application in February 2013,[4] the Court may not reverse the ALJ's findings based solely on non-compliance with the POM, which is not "judicially enforceable." *Kennedy*, 738 F.3d at 1177-78. Further, Plaintiff did not press an argument for equivalency (let alone one under the POM) before the ALJ, so the ALJ did not err in failing to specifically discuss it.

B.   ALJ's Assessment of Migraine Headaches (Step 4)

Dr. Ciletti testified about the severity of his migraine headaches. The record also includes opinions and/or treatment notes from his treating physicians, Dr. Mikeladze and Dr. Choi. The ALJ discredited Dr. Ciletti's claimed limitations because they were inconsistent with a cruise vacation he took, daily activities like taking his kids to school, and exercise or gym visits. The ALJ also dismissed Dr. Mikeladze and Dr. Choi's opinions about the severity of the migraines and impact on his ability to function as "vague." As explained below, the ALJ lacked substantial evidence to discredit the claimant and physicians.

---

[4] The parties did not address the question of retroactive application, but it appears to be immaterial so the Court need not resolve it.

1          1.      Dr. Ciletti's Testimony Regarding Migraines

          When evaluating whether a claimant's testimony regarding subjective symptoms is

credible, an ALJ must follow a two-step analysis. First, the ALJ determines whether the claimant

presented objective medical evidence of an impairment which "could reasonably be expected to"

cause "some degree of" the declared symptoms. *Smolen v. Chater,* 80 F.3d 1273, 1281 (9th Cir.

1996). If so "and there is no evidence of malingering, then the ALJ can reject the claimant's

testimony about the severity of her symptoms only by offering specific, clear and convincing

reasons for doing so." *Id.* The findings "must be sufficiently specific to allow a reviewing court

to conclude the [ALJ] rejected the claimant's testimony on permissible grounds and did not

arbitrarily discredit the claimant's testimony." *Rollins v. Massanari*, 261 F.3d 853, 856-57 (9th

Cir. 2001) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991)). "This is not an easy

requirement to meet: 'The clear and convincing standard is the most demanding required in Social

Security cases.'" *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v.

Comm'r of Soc. Sec. Admin*., 278 F.3d 920, 924 (9th Cir. 2002)). The ALJ may consider several

factors in making a credibility determination, including: "(1) whether the claimant engages in

daily activities inconsistent with the alleged symptoms; (2) whether the claimant takes medication

or undergoes other treatment for the symptoms; (3) whether the claimant fails to follow, without

adequate explanation, a prescribed course of treatment; and (4) whether the alleged symptoms are

consistent with the medical evidence." *Lingenfelter v. Astrue,* 504 F.3d 1028, 1040 (9th Cir.

2007). If supported by substantial evidence, such factors could constitute "specific, clear and

convincing reasons" for rejecting the claimant's testimony. *Id.*

          Here, the ALJ concluded that although "the claimant's medically determinable

impairments could reasonably be expected to cause the alleged symptoms[,]. . . the claimant's

statements concerning the intensity, persistence and limiting effects of these symptoms are not

entirely consistent with the medical evidence and other evidence in the record[.]" AR 34.

Because the ALJ acknowledged that Dr. Ciletti's medical impairments could reasonably cause the

alleged headache symptoms, he was required to "offer[] specific, clear and convincing reasons" to

reject Dr. Ciletti's testimony about their severity. *Smolen*, 80 F.3d at 1281. The ALJ relied

principally on Dr. Ciletti's daily activities to discredit his testimony regarding the headaches' severity. Daily activities are a basis for discrediting a claimant's testimony if they occupy a substantial part of his time, are incompatible with his claimed functionality limitations, and are evidence of transferable work skills. *Lingenfelter*, 504 F.3d at 1040 (daily activities must be "inconsistent with alleged symptoms"); *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989) (everyday activities must show that "a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that *are* transferable to a work setting" to support adverse credibility determination (emphasis in original)). As explained below, the evidence cited by the ALJ does not meet this standard.

a. <u>Vacation</u>

First, the ALJ relied on the fact that Dr. Ciletti "went on a Disney cruise in August 2013" to discredit his testimony. AR 34. Specifically, the ALJ stated that "the claimant's decision to go on a vacation tends to suggest that his symptoms did not result in a complete inability to function." *Id.* That judgment was legally erroneous because a claimant need not show "a complete inability to function" to qualify as disabled. *See Bowen*, 885 F.2d at 603 ("The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits."); *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) ("Several courts . . . have recognized that disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations."); *Cooper v. Brown*, 815 F.2d 557, 561 (9th Cir. 1987) ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." (quotation omitted)). Rather, the ALJ should have considered whether participation in a cruise was incompatible with Dr. Ciletti's claimed limitations.

To the extent the ALJ implicitly reached that conclusion, it was unsupported by substantial evidence. The record is devoid of any evidence about what Dr. Ciletti did or did not do on the cruise; it merely indicates a cruise was planned. *See* AR 663 ("Preparing for Disney cruise"); AR 669 ("Preparing for Disney cruise after next visit"); AR 678 ("Will be returning from Disney cruise"). The ALJ offered no explanation how Dr. Ciletti's mere participation in a cruise contradicted his statements "concerning the intensity, persistence and limiting effects of [his]

9

symptoms." AR 34. Dr. Ciletti did not claim that he was so debilitated he could not even move or leave his house, but rather, that his headaches were constant and that though he tried his best to perform *some* productive activity everyday, inevitably the headaches would become so severe (particularly if a migraine was triggered) that he would need to lie down for several hours or possibly overnight to recover. The record does not contain any information suggesting that Dr. Ciletti could not have responded to his symptoms in the same way on a cruise. Nor did the ALJ find that the performance of physical functions as a passenger on a cruise is transferable to a work setting. *Fair*, 885 F.2d at 603.

For these reasons, the ALJ's decision to discount Dr. Ciletti's testimony based on the vacation was not supported by substantial evidence. *See Popa v. Berryhill*, 868 F.3d 764, 769 (9th Cir. 2017), *as amended by* --- F.3d ----, 2017 WL 4160041 (9th Cir. Sep. 20, 2017) (reversing where "the ALJ provided no explanation as to why [petitioner's] ability to attend church weekly in the past, shop for groceries, and watch television, establish that [she] possesses the ability to maintain regular attendance at work"); *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (credibility determination insufficiently specific where "the ALJ did not elaborate on *which* daily activities conflicted with *which* part of Claimant's testimony" (emphasis in original)).

b.    Errands

The ALJ also concluded that Dr. Ciletti's daily activities were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." AR 34. The ALJ explained:

> Specifically, [Dr. Ciletti] testified that he helps his son get ready for school, takes his son to school and then goes to a coffee shop and reads. The claimant said he picks his son up at 3 PM and takes him to speech therapy or takes him swimming. The claimant cooks dinner and then is in bed by 9:30. He is able to vacuum and sweep. The claimant is able to do simple home repairs. Despite his chronic headaches, he was working out three days a week, doing pilates and playing basketball (Exs. 4F, 8F). In April 2013, he was able to go to the gym regularly, play basketball and carry his 50-pound son (Ex. 8F).

*Id.*

The ALJ's summary of the testimony is misleading. Contrary to the ALJ's summary, Dr.

Ciletti did not state that he regularly goes to coffee shops and reads, but rather, that he "tries" to do so, AR 34, but often has "a very difficult time" because sometimes "reading even a few lines triggers my migraine" (including stretches lasting two months) and "even the best of times it's difficult for me to read more than really like ten minutes or so, and I'm really having pain." AR 78-79. A claimant's daily activities may be a legitimate basis to discredit his allegations only "[i]f a claimant is able to spend a *substantial part of his day* engaged in pursuits involving the performance of physical functions that are transferable to a work setting[.]" *Morgan*, 169 F.3d at 600 (emphasis added); *see also Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) (reversing credibility determination because claimant's daily physical activities "did not consume a *substantial part* of [her] day"). The record lacks substantial evidence to support a conclusion that Dr. Ciletti could spend "a substantial part of his day" reading.

The ALJ's summary also ignored important qualifications and limitations that Dr. Ciletti described with respect to these activities. For example, the ALJ noted that Dr. Ciletti drove his son to school, but omitted contextual information that the school was one block away from the home—a rather modest activity, and certainly not one likely to occupy a substantial part of Dr. Ciletti's day, or one that contradicts his claims about his headaches. AR 94.

c.    Exercise

The ALJ also relied on Dr. Ciletti's exercise regimen to discredit his claims about the severity of his headaches. For example, the ALJ stated that "[i]n September 2012, [Dr. Ciletti] reported constant headaches and said he was taking time off work . . . . [y]et, he was working out three days a week, doing pilates and playing basketball." AR 35. Many of these activities were part of a physical therapy treatment program related to injuries not at issue in this disability application. *See*, *e.g.*, AR 463 (recommended physical therapy treatment included pilates exercises, jump rope, bike intervals, treadmill, etc.). The ALJ also noted that "[d]uring a physical therapy visit in March 2014, the claimant said he had been miserable with chronic headaches. Yet, he was able to continue to work out and in fact had been exercising more." AR 35. This too was related to Dr. Ciletti's physical therapy program. *See* AR 762.

There is no evidence in the record regarding the amount of time Dr. Ciletti spent in

United States District Court
Northern District of California

physical therapy or exercising, and thus no evidence that he spent a "substantial part of his day," *Bowen,* 885 F.2d at 603, at the gym or exercising. Further, the ALJ's summary omitted the material caveat stated by Dr. Ciletti: he "tries" to go to the gym but "often when I go . . . I wind up just taking a steam shower because I'm in pain and I'm uncomfortable." AR 77. Dr. Ciletti also described the lengths to which he must go at the gym and other public places to avoid exposure to the electronic screens that trigger his migraines. AR 77-78 ("[T]rying to navigate the gym is even very difficult because there are screens everywhere, everybody has a cell phone, they have it on their arms, you know, trying to avoid people.").

Thus, Dr. Ciletti clearly explained that his exercise activity was constrained by his headaches and that he needed to take frequent and regular breaks. The ALJ therefore had no basis to conclude that Dr. Ciletti's ability to manage or tolerate his headaches during limited exercise (during which he could take breaks, stop, leave, or rest according to his abilities) meant that he could also perform in a work environment where he would lack that flexibility. *Cf. Popa,* 872 F.3d at 906 (holding that activities like weekly church attendance, grocery shopping, and watching television do not demonstrate that claimant has "the ability to maintain regular attendance at work"); *Fair*, 885 F.2d at 603 (observing that "many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication").

Because Dr. Ciletti described the significant limitations on his ability to exercise (to which there was no contrary evidence), this case is unlike others where the claimant's daily activities were found to be incompatible with their claimed symptoms. *Compare Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (holding that claim of "totally disabling pain" was incompatible with regular daily activities of "attending to the needs of her two young children, cooking, housekeeping, laundry, shopping, attending therapy and various other meetings every week, and so forth" especially where claimant did not explain those activities were limited) *with Revels v. Berryhill*, 874 F.3d 648, 668 (9th Cir. 2017) (holding that ALJ erred because daily activities like using bathroom, taking kids to school, performing household chores, and so on were not incompatible with pain claims where the claimant "repeatedly and consistently described the

severe limitations on her ability to complete daily activities").  The types of exercise Dr. Ciletti performed were not inherently incompatible with suffering from migraines or persistent headaches.  *Compare Burch v. Barnhart*, 400 F.3d 676, 680-81 (9th Cir. 2005) (severity of lower back injury validly called into question by claimant's testimony about regular physical exertion cooking, cleaning, and shopping).  The ALJ made no finding that Dr. Ciletti—a practicing surgeon for 11 years—was malingering.  *See Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (claimant's subjective pain testimony was not credited because the ALJ "f[ound] no objective medical evidence" to support it and the claimant had "an 'extremely poor work history' and 'ha[d] shown little propensity to work in her lifetime'").

In sum, it was improper for the ALJ to discredit Dr. Ciletti's pain testimony with respect to his migraines based on his vacation, his physical therapy, his daily activities, and his exercise because the record lacks substantial evidence that these limited activities were incompatible with his symptoms, that they occupied a substantial part of his day, or that they demonstrated an ability to perform in the work setting.  This error was prejudicial because it was central to the ALJ's finding that Dr. Ciletti could perform full-time, medium-level work.

### 2.     Treating Physicians' Opinions Re Migraines

Dr. Ciletti contends that the ALJ improperly discredited Dr. Mikeladze and Dr. Choi's opinions regarding the severity of his migraine headaches.  Both doctors treated Dr. Ciletti.  The opinion of a treating physician is afforded more weight than a non-treating physician.  *See Orn v. Astrue*, 495 F.3d 625, 631-33 (9th Cir. 2007); 20 C.F.R. § 404.1527(c)(2).  When a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it is given "controlling weight."  20 C.F.R. § 404.1527(c)(2); *Orn*, 495 F.3d at 631.  "If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [SSA] considers specified factors in determining the weight it will be given."  *Orn*, 495 F.3d at 631.  The factors include "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record, and specialization of the

physician." *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (citing 20 C.F.R. § 1527(c)(2)-(6)).  Failure to consider these factors "alone constitutes reversible legal error." *Id.* at 676.

### a.    Dr. Mikeladze on Migraine Headaches

Dr. Georgi Mikeladze, the Chief of Chronic Pain Management at Kaiser Permanent in San Francisco, was his treating physician for over six years, from 2010 to at least 2016.  Dr. Mikeladze offered a formal opinion letter dated February 23, 2016.  *See* AR 1579-1581.  Dr. Mikeladze's opinion letter described Dr. Ciletti's headache symptoms and treatment history, noting that Dr. Ciletti suffers from a chronic, 24-hour daily headache which is sometimes exacerbated by a severe migraine that has been "recalcitrant to every medical and non-medical form of intervention thus far."  AR 1579.  Dr. Mikeladze noted that the headaches and migraines, in particular the fact that they are triggered by electronic images, "has completely altered his life and that of his family, as he must constantly try to avoid electronic stimuli[.]"  AR 1579.  Dr. Mikeladze opined that Dr. Ciletti "had a very difficult and unfortunate situation that left him extremely handicapped from interacting with the world in a normal way" and that his "prognosis was poor and he was unlikely to improve enough to resume his practice or take on any other vocation."  AR 38.

The ALJ gave "some limited weight [to the opinion] as the chronic nature of the claimant's headaches and his need for multiple doses of Norco would reasonably preclude him from performing his past work as a surgeon."  *Id.*  However, the ALJ stated that "the doctor's opinion that it was unlikely [Dr. Ciletti] could perform any other vocation, is vague and does not set forth the claimant's functional abilities with sufficient specificity."  *Id.*  Further, the ALJ thought that Dr. Ciletti's ability to perform work was "an opinion on an issue reserved to the Commissioner (20 CFR 404.1527(e)(2))."  *Id.*

### i.    Failure to Weigh Dr. Mikeladze's Opinion

The ALJ did not engage in any explicit discussion of the weight that should be afforded Dr. Mikeladze's opinion as a treating physician under 20 C.F.R. § 1527(c)(2).  The ALJ did not find, for example, that Dr. Mikeladze's opinions were not "well supported" or "inconsistent with other substantial evidence."  *Orn*, 495 F.3d at 631.  To the extent Dr. Mikeladze's opinion was inconsistent with assessments by Defendant's examining physician (Dr. Sharma) and the state

agency consultants who determined Plaintiff could perform "medium work," *see* AR 548-556, AR 38, and thus Dr. Mikeladze's opinion was not entitled to "controlling weight," the ALJ was required to consider factors such as Dr. Mikeladze's long-term treating relationship and expertise to determine how his opinion should be weighed in comparison to the state agency consultant or examining physician Dr. Sharma before disregarding the treating physician. *Trevizo*, 871 F.3d at 675. Furthermore, when such a conflict between a treating and examining physician exists, "an ALJ may only reject [the treating physician's opinion] by providing specific and legitimate reasons that are supported by substantial evidence," such as "a detailed and thorough summary of the facts and conflicting clinical evidence, stating [the ALJ's] interpretation thereof, and making findings." *Id.* (quotations and citations omitted). The ALJ erred in failing to do so. In sum, the ALJ did not properly consider the weight of Dr. Mikeladze's opinion as a treating physician.

ii.     Failure to Develop the Record

The ALJ's discounting of Dr. Mikeladze's opinion as "vague" was also improper. AR 38. Where the treating physician's testimony requires further clarity, the ALJ should "conduct an appropriate inquiry, for example, by subpoenaeing the physicians or submitting further questions to them." *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996); *see also Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (explaining that the ALJ's independent duty to develop the record is triggered by "[a]mbiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence," including when physician's records are "confusing" and further clarity could assist) (citation and quotation omitted). There was good reason for doing so here because Dr. Mikeladze was Dr. Ciletti's treating physician and was familiar with his medical condition. Yet, the ALJ failed to develop the record to clarify the purported vagueness.

In any event, the ALJ erred in concluding that Dr. Mikeladze's opinion was vague. Dr. Mikeladze's letter describes Dr. Ciletti's treatment history at length, including specific information about the triggers for the migraines, the numerous failed treatments that were attempted, and the impact on Dr. Ciletti's work as a plastic surgeon. AR 1579-81. Dr. Mikeladze's opinion that Dr. Ciletti was "extremely handicapped from interacting with the world

in a normal way" and that "[h]is prognosis is poor and he is unlikely to improve enough to resume his practice" was specific and was based on that treatment history, as corroborated by voluminous medical records. Dr. Mikeladze specifically described how Dr. Ciletti's migraines impinged on his functional abilities, including that headaches have "completely altered [Dr. Ciletti's] life and that of his family, as he must constantly try to avoid electronic stimuli," that his condition was "recalcitrant to every medical and non-medical form of intervention," that the migraines can be triggered "instantaneously simply by glancing at any cell phone, computer screen, [etc.]," that "[t]he headache provoked is all encompassing and disabling and is only abated by sleeping overnight," that it "is not mitigated by limiting the amount of exposure or by filtering out blue light or by decreasing the brightness of the electronic screen," and that "[h]is prognosis is poor." AR 1579. Dr. Mikeladze also described in detail the various attempts at treatment which have failed, including, *e.g.*, how different medications "have either worsened his headache or caused intolerable side effects." AR 1580. In short, the letter was not conclusory or vague as to the severity of the headaches and their resistance to treatment.

The cases cited by Defendant are not comparable to the facts here. *See Batson v. Commissioner of Social Security Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (ALJ discounted opinion of physician because it was nothing more than a checklist without supporting clinical findings); *Thomas*, 278 F.3d at 957 (ALJ properly discounted medical opinion when doctor changed functionality assessment to find disability without explanation or new objective findings). Here, Dr. Mikeladze's opinion was far more substantial, consistent, and specific than those in *Batson* and *Thomas*.

### iii.    Issues Reserved to the Commissioner

Furthermore, the ALJ erred in discounting Dr. Mikeladze's opinion about Dr. Ciletti's ability to perform past work or other relevant work. It is true that the question whether one is disabled is a legal question that may turn on non-medical factors and thus reserved for the Commissioner. *See* 20 C.F.R. § 404.1527(d); *see also McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011) (explaining that a physician's opinion about ability to do work "may be useful or suggestive of useful information," but "[t]he law reserves the disability determination to the

1    Commissioner" because it is not based solely on medical factors but also relates to "education,

2    age, technological, economic, and social factors"). However, Dr. Mikeladze's opinion about Dr.

3    Ciletti's inability to work was premised on his assessment of Dr. Ciletti's medical condition and

4    resulting functional limitations, a valid subject of medical expertise which may be entitled to

5    deference. *See*, *e.g.*, *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012) (ALJ erred in ignoring

6    and failing to discuss medical opinion where opinion was "not a conclusory statement" about

7    ability to work but rather "an assessment, based on objective medical evidence"); *Popa*, 872 F.3d

8    at 906 (ALJ erred by discounting physician's testimony that claimant was "not likely to maintain

9    regular [work] attendance"). Dr. Mikeladze's opinion that Dr. Ciletti "was unlikely to improve

10   enough to resume his practice or take on any other vocation," AR 38, was based on his medical

11   prognosis in light of the treatment history, and that prognosis was entitled to weight by the ALJ as

12   discussed above.

13        In sum, the ALJ lacked substantial evidence to discredit Dr. Mikeladze's opinions about

14   the migraine headaches as a treating physician. The ALJ did not engage in the required weighing

15   of Dr. Mikeladze's opinion under *Orn* and *Trevizo*. Further, the ALJ erred in discounting Dr.

16   Mikeladze's opinion as vague. If it was vague, the ALJ should have tried to develop the record

17   before disregarding it.

18                   b.      Dr. Choi on Migraine Headaches

19        Dr. Young Me Choi has been Dr. Ciletti's primary care physician since at least January

20   2013. He did not offer a formal opinion but extensive medical records pertaining to his treatment

21   reflect Dr. Ciletti's reported headache symptoms. *See* AR 500-547, AR 592-677. The treatment

22   notes do not explicitly describe Dr. Ciletti's functional limitations (other than recounting Dr.

23   Ciletti's claimed symptoms), but they indicate that Dr. Choi rendered an opinion of disability

24   when he placed Dr. Ciletti on work leave for several months in early 2013. *See* AR 540 ("Work

25   note given for 4 more months. Filed for permanent disability."), 626 (same). The ALJ gave "no

26   weight" to Dr. Choi's finding that Dr. Ciletti was permanently disabled because it was "vague and

27   do[es] not set forth the claimant's functional abilities with sufficient specificity." *Id.*

28        Unlike Dr. Mikeladze's opinion, Dr. Choi's was vague. He does not explain specifically

                                                    17

how or why he reached a conclusion of "permanent disability," perhaps because the reference appears only in passing in a treatment note and not a formal opinion letter. Nevertheless, before disregarding the opinion of Dr. Choi, a treating physician, the ALJ should have inquired to clarify the basis of Dr. Choi's opinion to determine what were Dr. Ciletti's symptoms and how they interfered with his ability to function (and thus work). *See Tonapetyan*, *supra*; *Smolen*, *supra*; *Orn*, *supra*; *Trevizo*, *supra*.

C.    ALJ's Assessment of Dr. Ciletti's Knee Injury (Step 4)

Dr. Ciletti also contends that the ALJ improperly discounted his testimony and opinions of his treating physicians with respect to a knee injury he sustained in 2014 that thereafter required surgery. Each issue is discussed below.

1.    Dr. Ciletti's Testimony

Dr. Ciletti also claims the ALJ lacked substantial evidence to discount Dr. Ciletti's claim of knee pain and difficulty walking and standing after an injury he sustained in March 2014 and subsequent knee surgery in May 2014. The medical records indicate that, as of October 2014 (approximately 6 months after his knee surgery), Dr. Ciletti was still reporting "frustrat[ion] with soreness and difficulty with walking." AR 1270. At the time of the hearing, Dr. Ciletti testified that he could stand two to three minutes without pain before needing to shift his weight, could walk about 15 minutes but would start to feel significant pain within a few blocks, and could sit for up to 30 minutes before needing to move around a little bit. AR 76.

The ALJ found Dr. Ciletti's testimony was "not entirely consistent with the medical evidence and other evidence in the record," AR 34, but it is unclear whether the ALJ's statement referred to Dr. Ciletti's knee pain, the headaches, or both. Assuming it included his knee pain, the ALJ did not specifically identify the inconsistent medical evidence. In her briefing, Defendant cites to scattered medical records to attempt to explain the ALJ's finding, but the cited material was not the articulated basis of the ALJ's opinion, *see Trevizo*, 871 F.3d at 575, and, in any event, does not constitute substantial evidence of an inconsistency. *See, e.g.*, AR 1398 (July 2015 – cursory treatment note that "arm-swing normal" with respect to gait; AR 1469 (noting Dr. Ciletti's Feb. 2015 claim he could only walk 1 block and observing "tenderness medially" in left knee; AR

United States District Court
Northern District of California

1383 (noting Dr. Ciletti's May 2015 claim of inability to walk more than 2-3 blocks or stand long periods of time without knee pain; although the doctor could not isolate the cause, he did not question Dr. Ciletti's symptoms). None of this is clearly inconsistent with Dr. Ciletti's testimony. Accordingly, the ALJ did not "offer[] specific, clear and convincing reasons," *Smolen*, 80 F.3d at 1281, for discounting Dr. Ciletti's claims of knee pain and lacked substantial evidence to do so.

Defendant suggests Dr. Ciletti's daily activities (discussed above) as a basis to question his claims of knee pain, but the ALJ did not cite them as a reason for discrediting Dr. Ciletti's testimony, so those activities are not a valid basis to uphold the ALJ's decision. *See Trevizo*, 871 F.3d at 575 ("We review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." (quoting *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2004)). In any case, Defendant cites mainly Dr. Ciletti's exercise and gym regimen as proof of inconsistency, but the material cited refers to Dr. Ciletti's physical therapy routine, *see* AR 1231-32 (July 2014 – reporting that patient is still on physical therapy routine and was a bit sore after workout and describing the 30-minute physical therapy plan); AR 1244 (August 2014 – same); AR 320 (December 2016 – narrative from Dr. Ciletti stating that he began outdoor cycling for cardio activity which he "tolerated relatively well," but unclear why this means he would be able to stand or walk more than he claimed). Moreover, as mentioned above, Dr. Ciletti testified about how his knee injury limited his ability to exercise. *See* AR 77 ("[O]ften when I go to the gym these days I wind up just taking a steam shower because I'm in pain and I'm uncomfortable. But when I do go to the gym and actually do some exercise *I try to do things that don't bother my knee*." (emphasis added)). Defendant also cites Dr. Ciletti's swimming exercises, but they are not weight-bearing so do not negate his claimed knee pain in connection with standing and walking, *see* AR 1584 (August 2015 – Dr. Ciletti's statement that he has difficulty standing/cooking and experiences left knee medial pain but swims 6 times a week as exercise). Also these exercises were limited. AR 78 (when swimming, sometimes "I do laps and other times I'll do just sort of water exercises"). Accordingly, the ALJ had no substantial basis to discredit Dr. Ciletti.

2.      Drs. Lehmann, Hinman, and Dillingham on Knee Impairment

Plaintiff also contends that the ALJ lacked substantial evidence to ignore the purportedly uncontroverted opinions of Drs. Lehmann, Hinman, and Dillingham regarding the severity of his knee condition following his injury and surgery. These physicians treated Dr. Ciletti for his knee injury; the most prominent was Dr. Lehmann, who performed the knee surgery and supervised his recovery. *See* AR 769, 796-798, 828, 915, 1250, 1251, 1261, 1268, 1270, 1270-71. The materials cited by Plaintiff, however, do not constitute "medical opinions" regarding the severity of the pain or any associated restrictions as defined by regulation. *See* 20 C.F.R. § 404.1527(a)(1) ("Medical opinions are statements from acceptable medical sources that reflect *judgments* about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." (emphasis added)). Rather, they merely reflect the doctors' notes memorializing Dr. Ciletti's complaints of pain, but without offering any judgment as to the severity of the pain, a diagnosis, a prognosis, or any limitations caused by the pain.[5] The ALJ was not obligated to defer to notes that did not reflect the physicians' medical judgment.

Nonetheless, even without supportive medical opinions, the ALJ did not have sufficient reason to reject Dr. Ciletti's testimony about his knee pain and resulting restrictions on activities.

D.      RFC Determination (Step 4)

As explained above, the ALJ lacked substantial evidence to discount Dr. Ciletti's testimony and Dr. Mikeladze's opinion concerning the headache and migraine symptoms. In addition, the ALJ lacked substantial evidence to discount Dr. Choi's opinion as vague, at least without first attempting to further develop the record. The ALJ's RFC therefore failed to account for the full scope of the limitations caused by Dr. Ciletti's headaches and migraines. *See*, *e.g.*, *Moore v. Colvin*, 743 F.3d 1118, 1127-28 (7th Cir. 2014) (ALJ's failure to "reflect . . . likelihood

---

[5] *See* AR 18, 20 (Dr. Dillingham documenting report of knee pain without opining); AR 1419-20 (summarizing pain symptoms reported by Dr. Ciletti); AR 1261, 1268 (Dr. Lehmann's cursory treatment summary that patient was injected with supartz after reporting knee pain, but without opining); AR 1250, 1270 (memorializing patient narrative without opining); AR 1383, 1525 (same, by Dr. Hinman).

of absences or breaks at work related to migraines" in RFC required remand for further proceedings).

With respect to the knee injury, the ALJ lacked substantial evidence to discredit Dr. Ciletti's testimony, particularly because the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." AR 34. The *sole* support cited for the ALJ's RFC on Dr. Ciletti's physical functionality was Dr. Satesh Sharma's June 22, 2013 assessment that Dr. Ciletti could sit, stand, and walk for six hours a day. AR 548-556. Dr. Sharma's assessment does not constitute substantial evidence because it was rendered *before* the March 2014 knee injury and May 2014 surgery. AR 548-556. Hence, the assessment could not have accounted for the knee injury and any associated limitations. The ALJ therefore lacked substantial evidence to give Dr. Sharma's opinion "great weight." AR 37. In these circumstances, the ALJ was required to credit Dr. Ciletti's testimony regarding his knee pain in determining the RFC. The ALJ failed to do so. The RFC determination was fatally defective.

E.     Ability to Perform Work in National Economy (Step 5)

Using the faulty RFC discussed above, the ALJ presented the Vocational Expert ("VE") with a hypothetical that did not account for all of Dr. Ciletti's limitations, particularly his baseline headaches, periodic severe migraine headaches, need for several hours of rest a day, and knee injury. The incomplete hypothetical means that, as a matter of law, the VE's testimony "has no evidentiary value." *Ghanim v. Colvin*, 763 F.3d 1154, 1166 (9th Cir. 2014) (quoting *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1166 (9th Cir. 2008)); *Pappenburg v. Comm. of SSA*, 68 Fed.Appx. 16 (9th Cir. 2003) (ALJ's failure to account for headaches in hypothetical precluded VE's responsive testimony from constituting substantial evidence). The ALJ's conclusion that Dr. Ciletti could perform jobs requiring "medium work" in the national economy was therefore unsupported by substantial evidence.

F.     Remand for Award of Benefits or Further Proceedings

The parties disagree whether the Court should remand for an award of benefits or for further proceedings. With respect to the ALJ's unsupported disregard for the medical opinions of the treating physicians, "[w]here the Commissioner fails to provide adequate reasons for rejecting

the opinion . . . we credit that opinion 'as a matter of law.'" *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995) (quoting *Hammock v. Bowen*, 879 F.2d 498, 502 (9th Cir. 1989)).  Similarly, with respect to Dr. Ciletti's subjective pain testimony, the Court "will not remand for further proceedings where, taking the claimant's testimony as true, the ALJ would clearly be required to award benefits." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1041 (9th Cir. 2007).

Applying these two rules, remand for further proceedings is unwarranted on this record. Though Dr. Choi's opinions are vague and unclear (and thus would require further development before an award of benefits), Dr. Mikeladze's is not and no further development is necessary.  He opined that Dr. Ciletti's migraines and headaches are "recalcitrant to every medical and non-medical form of intervention thus far," AR 1579, and that based on his treatment history, he understands that the condition "has completely altered [Dr. Ciletti's] life and that of his family, as he must constantly try to avoid electronic stimuli[.]" AR 1579.  Dr. Mikeladze stated that Dr. Ciletti's condition "leaves him extremely handicapped from interacting with the world in a normal way," that his "prognosis is poor," and that he is "unlikely to improve enough to resume his practice or take on any other vocation."  AR 1581.

Furthermore, Dr. Ciletti testified that he must lie down as a result of his headaches and medication "about two or three hours [a day], at least," AR 91, but "probably five or six – it's the whole after – early midmorning to afternoon."  AR 92.  His migraines happen "nearly every day of the month," perhaps "25 days a month."  *Id.*  When he does not have a migraine, he has baseline headaches which are exacerbated by reading within 10 minutes, and he sometimes cannot even tolerate reading a restaurant menu.  AR 93.

Taking the testimony of Dr. Ciletti and opinion of Dr. Mikeladze as true, Dr. Ciletti's migraine and headache symptoms would render him disabled based on the VE's testimony that a person who needed to lie down three or more hours a day is "clearly not employable."  AR 110; *see also Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir. 1989) (observing that "the capability to work only a few hours per day does not constitute the ability to engage in substantial gainful activity" and reversing and remand for award of benefits where record showed claimant could work no more than four hours per day).  The severity of Dr. Ciletti's migraines, the failure of a

22

treatment regimen, and the unavailability of work for a person who must lie down several hours a day establish that Dr. Ciletti is disabled and that no purpose would be served by further development of the record on this point.

Crediting Dr. Ciletti's testimony, the finding of disability is also bolstered by the physical limitations associated with Dr. Ciletti's knee injury, including his ability to stand only 2-3 minutes before needing to shift his weight to mitigate pain, walk up to 15 minutes before significant pain, and sit up to 30 minutes before needing to get up to move around a little bit. AR 76. This clearly establishes that Dr. Ciletti cannot perform "medium work," which requires "standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday." SSR 83-10. It also appears that he would encounter serious difficulties performing "light work," which involves "standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday," *id.*, and "sedentary work," which may involve "periods of standing or walking . . . total[ing] no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." *Id.* In particular, the VE testified that Dr. Ciletti lacked transferable skills to "light" occupations that do not involve video screens. AR 110.

The matter is remanded for an award of benefits under *Lester* and *Lingenfelter*.

### IV.     CONCLUSION

The ALJ lacked substantial evidence to discredit the opinions of Dr. Mikeladze and Dr. Choi as well as Dr. Ciletti's testimony about pain and resulting limitations. The RFC was based upon unsupported premises, and thus, the VE's testimony based on that RFC carried no evidentiary weight. Crediting Dr. Mikeladze's opinion and Dr. Ciletti's pain testimony, the VE's testimony establishes that there is no substantial gainful activity which Dr. Ciletti could perform.

///

///

///

///

///

///

Accordingly, Dr. Ciletti is disabled and entitled to benefits. Plaintiff's motion for summary judgment is **GRANTED** and Defendant's cross-motion is **DENIED**. The Court **REMANDS** to the Commissioner for an award of benefits consistent with this order.

The Clerk of the Court shall enter judgment for Plaintiff and close the case.

This order disposes of Docket Nos. 17 and 23.


**IT IS SO ORDERED**.


Dated: June 8, 2018

_____
EDWARD M. CHEN
United States District Judge